**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION**

---

DAMIEN J. MORGAN,

     Plaintiff,

v.

                                  Case No. 2:23-cv-2744-MSN-cgc
                                  JURY DEMAND

MEMPHIS LIGHT, GAS & WATER,

     Defendant.

---

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

---

Following an altercation with his supervisor, Plaintiff, Damien J. Morgan, was suspended and then fired by his employer, Defendant Memphis Light, Gas & Water ("MLGW"). Defendant says it took these actions due to Plaintiff's violations of its workplace policies and the terms of previous disciplinary action to which Plaintiff was still subject. But Plaintiff asserts that his termination was the culmination of years of discriminatory treatment during his employment with Defendant. After filing a charge with the Equal Employment Opportunity Commission and receiving a "Right to Sue" letter, Plaintiff filed this lawsuit against his former employer.

Defendant now seeks summary judgment on all Plaintiff's claims. (ECF No. 63, "Motion.") Plaintiff responded in opposition (ECF No. 67), and Defendant filed a reply (ECF No. 71). For the reasons explained below, Defendant's Motion is **GRANTED**.

**BACKGROUND**

The following facts are undisputed unless noted otherwise. Defendant MLGW is a municipal utility service that the City of Memphis owns, operating it as a division of the city. (ECF

No. 1 at PageID 3.)  Plaintiff Damien Morgan is an African American male.  (ECF No. 67-1 at PageID 469.)  Defendant hired Plaintiff in 2008 as a Meter Reader, and it promoted him to a Facilities Locator position with the Construction Services/Facilities Locate division in 2016.  (*Id.*)  On August 1, 2023, Defendant terminated Plaintiff.  (ECF No. 67-1 at PageID 489; ECF No. 71-6 at PageID 1062.)

During the period at issue, Plaintiff's direct supervisors were Foreman Michael Matthews (white male) and Inspector Martin Jarrett (black male). (ECF No. 67-1 at PageID 471, 477; ECF No. 71-6 at PageID 1062.) Matthews and Jarrett reported to Stacey Blakney (white male), who was the General Supervisor over the Construction Services/Facilities Locate division. (ECF No. 67-1 at PageID 471; ECF No. 71-6 at PageID 1062.)  Blakney in turn reported to Gregory Deaton (white male), who was the Manager of Electric Construction and Maintenance until he retired in October 2023.  (ECF No. 67-1 at PageID 472; ECF No. 71-6 at PageID 1062.)

Several incidents underlie all Plaintiff's claims.  First, in May 2021, Blakney denied Plaintiff's request for a new work vehicle.  (ECF No. 67-1 at PageID 472.)  The new vehicle was instead assigned to Jason Ocampo (white male), even though Plaintiff was a more senior Locator. (*Id.* at PageID 472–73.)  Defendant admits that "trucks had previously been granted based on seniority," but says that Blakney overrode this policy because, at that time, Ocampo's existing truck had been totaled in a collision.  (*Id.* at PageID 472–73.)  Plaintiff filed a grievance with the Union[1] challenging Blakney's decision on June 8, 2021.  (*Id.* at PageID 473.)  The Union's "Step Two Response" to Plaintiff's grievance found that there was no violation of the Union's MOU.

---

[1] Throughout his employment with MLGW, Plaintiff was a member of the International Brotherhood of Electrical Workers, Local 1288 ("Union").  As a member, Plaintiff was entitled to submit grievances through Union representatives for any events he believed violated the Union's Memorandum of Understanding ("MOU") with MLGW.  (ECF No. 67-1 at PageID 469.)

(*Id.* at PageID 473–74.)  Although the grievance was resolved by settlement on June 17, 2021,

Plaintiff still asserts that his vehicle request was denied in part because of his race.  (*Id.*)

The second incident occurred a little over a year later in the fall of 2022[2] when Plaintiff

was denied participation in Defendant's Foreman Development Program.  That program allows

Locators to be trained to work as Foremen and accrue skills that could make them eligible for

promotion.  (ECF No. 67-1 at PageID 474.)  Employees do not apply for the program but are

appointed by their supervisors.  (*Id.*)  Eligible candidates are evaluated and chosen based on six

factors: leadership skills, attendance, safety, discipline, potential as a successful candidate, and

quality of work.  (*Id.*)  Plaintiff expressed interest in the program to his direct supervisors, Jarrett

and Matthews, and their supervisor, Blakney, who recommended employees for the program to his

supervisor, Deaton, who was ultimately responsible for selecting employees for the program.  (*Id.*

at PageID 474–76; ECF No. 71-6 at PageID 1065–67.)

Blakney recommended Ocampo for the program and did not recommend Plaintiff.[3]  (ECF

No. 67-1 at PageID 476.)  According to Blakney, Plaintiff was not qualified for the program due

to his insufficient ticket completion rate, poor attendance, and Blakney's assessment that Plaintiff

required "significant oversight" and "had not demonstrated the leadership skills expected of a well-

---

[2] The record is slightly inconsistent about the exact dates when Plaintiff sought and was denied admission to the Foreman Development Program.  In his response to Defendant's Statement of Undisputed Material Facts, Plaintiff admits Defendant's assertion that this event occurred in "late September/early October 2022." (ECF No. 67-1 at PageID 474.)  And that is mostly consistent with Plaintiff's Complaint, which alleged that he approached his supervisors in September 2022. (ECF No. 1 at PageID 4.)  In his response, however, Plaintiff says that he sought admission to the program in December 2022, (ECF No. 67-1 at PageID 476), and he also described the event as taking place "in late 2022," which Defendant then admitted.  (ECF No. 71-6 at PageID 1065.)

[3] It is unclear if the number of spots in the program was limited.  Plaintiff's descriptions imply only one spot was available, and Defendant did not directly respond to that description.  (*See* ECF No. 71-6 at PageID 1067 (asserting Ocampo received "the sole FD slot").)

qualified candidate." (*Id.* at PageID 475–76; ECF No. 71-6 at PageID 1067–68.) Plaintiff contests

Blakney's reasoning.  Plaintiff points out that his performance evaluations—which were approved

by Blakney—consistently rated him "Effective," with no documented deficiencies regarding work

output, attendance, or supervision, which Blakney acknowledged in his deposition.  (ECF No. 71-

6 at PageID 1067–68; ECF No. 67-1 at PageID 476; ECF No. 67-3 at PageID 582–83.)

According to Plaintiff, Blakney also told him that his 2019 Condition of Continued

Employment Agreement ("COCEA") was another factor that led Blakney to conclude Plaintiff was

not qualified for the program.  (ECF No. 67-5 at PageID 741–42; ECF No. 71-6 at PageID 1066–

67.)  The COCEA was issued following Plaintiff's dispute with a coworker on February 7, 2019.

(ECF No. 67-1 at PageID 470.)  According to MLGW, during the interaction with his coworker,

Plaintiff "used racial slurs and engaged in aggressive, confrontational conduct"; Plaintiff denies

that his conduct was "egregious" or violent.  (*Id.*)  Defendant, however, found that Plaintiff's

language and behavior violated several policies, including its Workplace Violence Policy, and

Plaintiff was suspended for nine days, required to undergo counseling, and placed on probation

until March 1, 2024. (*Id.* at PageID 470–71; ECF No. 63-6 at PageID 336.)  The COCEA also

provided that Plaintiff would be terminated immediately if he engaged in "intimidating, aggressive,

violent, or disrespectful behaviors" in the future, and that the COCEA would remain in Plaintiff's

employment record and Plaintiff's actions that led to the COCEA would "be considered in

determining discipline for any future incidents of intimidating, aggressive, violent, or disrespectful

behaviors."  (ECF No. 63-6 at PageID 337.)  Plaintiff signed the COCEA on March 1, 2019,

acknowledging and confirming he received the document while noting that he did not agree "with

the content of the document." (*Id.*)  The COCEA was also signed by William E. Thompson, the

Business Manager for the Union, and Anthony Rosser, Defendant's Manager of Physical and Electronic Security. (*Id.*)

In his Statement of Additional Material Facts, Plaintiff asserts that he "identified additional comparators: senior black Locators Wink Turner, Darius Townsend, and Shandell—each reportedly with strong records and no discipline—[who] were also passed over" for participation in the Foreman Development Program. (ECF No. 67 at PageID 450.) He also alleges that other Locators had been able to participate in the program previously despite having COCEAs in their records. (*Id.*) Specifically, Plaintiff testified that he believes there were two such people. (ECF No. 67-5 at PageID 744.) But Plaintiff could not recall the names of the individuals or the year they went through the program. (*Id.*) He said that one was a white female and the other a man, but he could not recall his race. (*Id.*)

Third, in October of 2022,[4] Matthews referred to Plaintiff using obscene language during a phone call about a job assignment. (ECF No. 67-1 at PageID 477–78.) Plaintiff had been assigned a job that he thought should have been given to a "road crew." (*Id.* at PageID 477.) Plaintiff went to Jarrett with his questions about the job. (*Id.*) But Jarrett was unable to answer Plaintiff's questions, so he called Matthews, who had gone home sick earlier that day. (*Id.*) Jarrett

---

[4] The record is again inconsistent regarding the precise date of this conversation. Plaintiff alleges in his Complaint that this occurred "[a]t the end of September 2022." (ECF No. 1 at PageID 4.) And in his response to Defendant's Statement of Undisputed Material Facts, he agrees with Defendant's assertion that the incident occurred in "late September/early October 2022," (ECF No. 67-1 at PageID 477), but in his Statement of Additional Material Facts, he says that it occurred on February 14, 2023, (ECF No. 67 at PageID 452). In its response to Plaintiff's Statement of Additional Material Facts, Defendant points out that the February date is incorrect and cites a Labor Engagement, Diversity & Inclusion Charge of Discrimination (described by Defendant as Grievance 22-36) that Plaintiff filed on December 8, 2022, which references the incident occurring on either October 18 or 19, 2022. (ECF No. 71-6 at PageID 1075; ECF No. 63-10 at PageID 408.) For purposes of summary judgment, the Court finds that the February 14, 2023, date is an inadvertent typographical error.

told Matthews that Plaintiff thought the job was not properly assigned to him and should have been assigned to a "road crew" instead. (*Id.*)  Matthews became frustrated and yelled to Jarrett, "Tell that motherfucker I said go do the job," which Plaintiff overheard. (*Id.*)  According to Defendant, Blakney later counseled Matthews on the necessity for professionalism over the phone, which Blakney described as an entry level form of discipline.  (ECF No. 67-1 at PageID 478; ECF No. 71-6 at PageID 1075.)  But Plaintiff says that, to his knowledge, Matthews did not receive any discipline for the incident. (ECF No. 67-5 at PageID 787–88; *see* ECF No. 67-1 at PageID 478.)

On December 8, 2022, Plaintiff filed a charge of discrimination with Defendant's Labor Engagement, Diversity & Inclusion ("LEDI") department, (ECF No. 63-10, "Complaint No. 22-36"), citing Matthews' obscenity in the October 2022 phone call and Plaintiff's exclusion from the Foreman Development Program.  (ECF No. 67-1 at PageID 478; *see also* ECF No. 63-10.)

Plaintiff also contends that his work truck was unexpectedly searched sometime "[i]n or about December 2022."  (ECF No. 67-1 at PageID 478–79.)  According to Defendant, mechanics at its shop told Blakney that Plaintiff's truck was missing required personal protective equipment. (*Id.*)  Blakney says that he then directed Freddie Hawkins, a Locator working out of class as an Inspector, to conduct site visits for as many Locators as he could to ensure that they had the necessary equipment.  (*Id.* at PageID 479.)  The alleged missing equipment was found behind the back seat of Plaintiff's truck during the December 18 search.  (*Id.*)

There was also an incident in which Matthews "raised his voice" at several black employees, including Plaintiff, and although Matthews apologized, he was not disciplined.  (ECF No. 71-6 at PageID 1075.)  Plaintiff does not say when this event occurred, but the deposition testimony cited in support references "the end of 2022."  (*Id.*; ECF No. 67-4 at PageID 661.)

6

Several months later, on April 27, 2023, Plaintiff participated in a conflict resolution call for the internal charge of discrimination he had filed on December 8, 2022 (Complaint No. 22-36); Plaintiff indicated when he filed the charge that he was willing to resolve it through Defendant's internal conflict resolution process.  (ECF No. 63-10 at PageID 409.)  Participating in that call were Plaintiff, Deaton, and Renée Daniel, a Representative with Defendant's LEDI department. (ECF No. 67-1 at PageID 480; ECF No. 63-11.)  That eventually led to a settlement agreement dated May 11, 2023, and signed by Plaintiff and Deaton on July 6, 2023, in which Defendant's management agreed to "communicate to all employees . . . to not use offensive/and or profane language . . . and adhere to the MLGW policy" regarding civil communications in the workplace. (ECF No. 63-11; ECF No. 67-1 at PageID 480; ECF No. 71-6 at PageID 1078.)  Plaintiff disputes, however, that the agreement represented a "genuine resolution" to his complaint, asserting that Deaton "announced no remedial action."  (ECF No. 67-1 at PageID 480.)

As part of the resolution process, Deaton also met with employees of the Facilities Locate Department on or about May 1, 2023,[5] to remind them of Defendant's workplace communications policy. (*Id.* at PageID 480–81.)  But Plaintiff alleges that he became the victim of "verbal abuse" from Deaton during the meeting.  (ECF No. 71-6 at PageID 1079; *see* ECF No. 63-12; *see also* ECF No. 67-6 at PageID 947.)  According to Plaintiff, after another employee commented that the civil communications rules "were a waste of time," Deaton responded, "I agree. But this is what happens when we have people going downtown complaining, it's all BS."  (ECF No. 67-6 at PageID 947.)  Plaintiff alleges that he then asked Deaton "what he meant by 'BS,'" and Deaton

---

[5] In its Statement of Undisputed Material Facts, Defendant dates this conversation to July 10, 2023. (ECF No. 63-2 at PageID 244.)  In his response, Plaintiff alleges that the meeting instead occurred on May 1, 2023, and that the July 10 date appears to reflect when Plaintiff filed his grievance related to Deaton's conduct at that meeting. (ECF No. 67-1 at PageID 480–81.)

7

denied that he said "BS." (*Id.*) Plaintiff says that Deaton then repeated his previous instructions, prompting Plaintiff to tell Deaton that was the point at which Plaintiff believed Deaton had said, "it's all BS." (*Id.*) According to Plaintiff, Deaton responded by shouting, "shut your mouth," in front of approximately 25 coworkers. (ECF No. 71-6 at PageID 1079–80; ECF No. 67-6 at PageID 947.)

A little over two months later, on July 10, 2023, Plaintiff filed a complaint against Deaton for what Plaintiff alleged was "verbal abuse" during that May meeting ("Grievance 23-11"). (ECF No. 71-6 at PageID 1079; *see* ECF No. 63-12; *see also* ECF No. 67-6 at PageID 947.) Deaton denies that the meeting occurred as Plaintiff described. (ECF No. 71-6 at PageID 1080; *see* ECF No. 67-1 at 13 ("Mr. Deaton, confused, denied saying anything different, and asked the individuals present if he made the statement Plaintiff claimed.").) Defendant's human resources department later concluded that there was no Title VII violation; it found that the substance of the allegation was a policy violation and issued correspondence indicating the matter was being transferred to Employee Services "for further investigation." (ECF No. 67-1 at PageID 482–83; ECF No. 63-13; ECF No. 63-12.)

Finally, on June 29, 2023, there was an altercation between Plaintiff and Matthews. (*See* ECF No. 67-1 at PageID 483–87; ECF No. 71-6 at PageID 1082–88.) Plaintiff received his annual performance evaluation on June 28. (ECF No. 67-1 at PageID 483.) The next day, Plaintiff approached Matthews in his office to ask about certain records related to his annual evaluation. (ECF No. 67-1 at PageID 484; ECF No. 71-6 at PageID 1082.) According to Plaintiff, Matthews was initially responsive, but he eventually refused to continue the conversation unless a witness was present. (ECF No. 67-1 at PageID 484.) Matthews asked Plaintiff to leave his office, and according to Plaintiff, as he was leaving, Matthews "shoved [him], grabbed his arm, and jabbed a

finger in his face." (ECF No. 71-6 at PageID 1082; ECF No. 67-1 at PageID 484.)  Plaintiff says

he "objected to the physical contact and raised his voice," but he denies that he threatened violence

or touched Matthews.  (ECF No. 67-1 at PageID 484.)  Other employees intervened, ultimately

separating Plaintiff and Matthews.  (*Id.* at PageID 486–87; ECF No. 71-6 at PageID 1083.)

Plaintiff also claims that, either during or immediately after the confrontation, Blakney exited his

office and stated, "You're done," while pointing at Plaintiff.  (ECF No. 67-1 at PageID 484.)  After,

Plaintiff made a report to Corporate Security Officer R. Cunnigham, alleging that Matthews had

assaulted him.  (ECF No. 67-1 at PageID 487.)

For its part, Defendant disputes much of Plaintiff's account of the June 29 incident. For

example, Defendant contends that Matthews declined to speak with Plaintiff only after Plaintiff

"became angry" when asked if he was keeping his own employment-related records.  (ECF No.

63-2 at PageID 245.)  According to Defendant, Matthews then "touched Plaintiff on his right elbow

to encourage him to leave," to which Plaintiff responded by "stripp[ing] off his hat, glasses, [and]

backpack" and then loudly telling Matthews, "If you want to hit me, hit me, go ahead." (*Id.* at

PageID 245–46.)  Defendant also says that, in response to Blakney's comment that Plaintiff "was

done," Plaintiff replied, "I'm done? You're done! I'll hit you too!"  (*Id.* at PageID 247.)  Plaintiff

denies stating that he would hit any of his supervisors; he says that, in response to Blakney, he

merely said, "No, you're done."  (ECF No. 63-4 at PageID 299.)

On the evening of June 29, 2023, Defendant indefinitely suspended Plaintiff while it

investigated the incident.  (ECF No. 67-1 at PageID 487; ECF No. 71-6 at PageID 1084.)  The

notice of Plaintiff's reprimand states that, "[a]ccording to preliminary findings, [Plaintiff] may

have made a statement or gesture after [Plaintiff's] Performance Appraisal (PA) that could be

interpreted as threatening . . . Stacey Blakney."  (ECF No. 63-15.)  Defendant's Corporate Security

9

Office investigated the incident, collecting written statements from several witnesses, including Matthews, Blakney, Ocampo, and eight other Locators who were present for the confrontation. (*See* ECF No. 63-18.)   Four of these witnesses—Blakney, Matthews, Ocampo, and Union Representative Devin Thompson—stated that they heard Plaintiff reply to Blakney, "I'll hit you too." (*Id.* at PageID 425–26.)  Plaintiff's interview with Officer Cunningham was also considered during the investigation.   (*Id.* at PageID 423–24; ECF No. 67-1 at PageID 489.) Corporate Security's Investigative Summary ultimately concluded that both Plaintiff and Matthews had violated Defendant's policies regarding workplace violence and civility in the workplace. (ECF No. 63-18 at PageID 427.)  The Investigative Summary further noted that Plaintiff "[had] a history of violence with MLGW, . . . [was] presently on COCEA for a [workplace violence] incident in 2019[,]" and that "[o]ther databases reflect[ed] [he] ha[d] a history of aggression with other people outside of MLGW."  (*Id.* at PageID 428.)

Defendant terminated Plaintiff's employment on August 1, 2023, citing the results of the Corporate Security investigation.  (*See* ECF No. 63-19; ECF No. 67-1 at PageID 489–90.) Plaintiff's termination letter also notes that his conduct during the June 29 incident violated Plaintiff's 2019 COCEA, which stated that "[a]ctions that led to [the COCEA] will be considered for determining discipline for any future incidents [of] threatening, intimidating, aggressive, violent, or disrespectful behaviors."   (ECF No. 63-19.)   Plaintiff filed a Union grievance challenging his termination that same day, followed by a charge of race discrimination and retaliation with the Tennessee Human Rights Commission and the Equal Employment Opportunity Commission ("EEOC") on August 9, 2023.  (ECF No. 67-1 at PageID 490; ECF No. 63-20; ECF No. 63-21; ECF No. 63-22.)  The EEOC issued Plaintiff a "Right to Sue" Letter on August 24,

2023, and Defendant denied the internal grievance on September 19, 2023. (ECF No. 67-1 at PageID 490; ECF No. 63-23.)

Plaintiff filed his Complaint in this matter on November 21, 2023, alleging claims for race discrimination, harassment creating a hostile work environment, and retaliation and retaliatory harassment in violation of Title VII of the Civil Rights Acts of 1964 ("Title VII"), the Tennessee Human Rights Act ("THRA"), and 42 U.S.C. § 1981; violations of his Fourteenth Amendment due process and equal protection rights pursuant to 42 U.S.C. § 1983; and negligent infliction of emotional distress in violation of the Tennessee Healthy Workplace Act ("THWA"). (ECF No. 1 at PageID 14–24.)

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 permits a party to move for summary judgment—and the Court to grant summary judgment—"if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of demonstrating that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party may discharge this burden either by producing evidence that demonstrates the absence of a genuine issue of material fact or simply "by showing—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325 (internal quotation marks omitted). The moving party can meet this burden by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of the case. *See* Fed. R. Civ. P. 56(c)(1). A party asserting the presence or absence of genuine issues of material facts must support its position either by "citing to particular parts of materials in the record," including depositions, documents, affidavits, declarations, stipulations, or other materials,

11

or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." *Id.*

When confronted with a properly supported motion for summary judgment, the nonmoving party must set forth specific facts showing that there is a genuine dispute for trial. The nonmovant must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (citing *DeLuca v. Atl. Refining Co.*, 176 F.2d 421, 423 (2d Cir. 1949)); *see also* Fed R. Civ. P. 56(c)(1); *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989) (citations omitted) ("The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.'").

In ruling on a motion for summary judgment, the Court must view the facts contained in the record and all inferences that can be drawn from those facts in the light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at 587 (citation omitted); *Nat'l Satellite Sports, Inc. v. Eliadis, Inc.*, 253 F.3d 900, 907 (6th Cir. 2001). The Court cannot weigh the evidence, judge the credibility of witnesses, or determine the truth of any matter in dispute. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The Court's role is limited to determining whether there is a genuine dispute about a material fact, that is, if the evidence in the case "is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. Such a determination requires that the Court "view the evidence presented through the prism of the substantive evidentiary burden" applicable to the case. *Id.* at 254. Thus, if the plaintiff must ultimately prove its case at trial by a preponderance of the evidence, on a motion for summary judgment, the Court must

12

determine whether a jury could reasonably find that the plaintiff's factual contentions are true by a preponderance of the evidence.  *See id.* at 252–53.

## **ANALYSIS**

### A.    **Timeliness of Plaintiff's Claims**

Before addressing the merits of Plaintiff's claims, Defendant's Motion first argues that Plaintiff's claims under § 1983 and the THRA are time-barred for acts that occurred prior to November 21, 2022—one year before he filed his Complaint in this matter.[6]  (ECF No. 63-1 at PageID 214–15.)

Under Tennessee law, THRA claims must be filed within one year after the alleged discriminatory practice ceases. Tenn. Code Ann. § 4-21-311(d).  So Plaintiff's THRA claims for discrete events that happened before November 21, 2022, one year before he initiated this action, are time-barred. *See id.*  So, too, with Plaintiff's 1983 claims, which are also subject to a one-year statute of limitations.  Tenn. Code Ann. § 28-3-104(a)(1); *see Wershe v. City of Detroit* , 112 F.4th 357, 365 (6th Cir. 2024) (explaining that § 1983 claims "borrow the personal-injury statute of limitations from the state in which the claim arose"); *Dibrell v. City of Knoxville*, 984 F.3d 1156, 1161 (6th Cir. 2021) (Tennessee's one-year statute of limitations for personal-injury torts applies to §1983 claims).

To start, at least one of Plaintiff's disparate treatment claims under the THRA and § 1983 is time-barred.  Although his Complaint does not specify the events on which these claims are

---

[6] Defendant also asserts that Plaintiff's NIED claim is time-barred by applicable Tennessee law to the extent it is based on events that occurred before November 21, 2022. (ECF No. 63-1 at PageID 214–15.)  But as explained later, Plaintiff has not offered sufficient facts to satisfy his evidentiary burden for his NIED claim. *See infra*, pp. 34–35.  For that reason, Defendant is entitled to summary judgment on the merits of that claim, and the Court need not address whether it also falls outside the relevant statutes of limitations.

based, (*see* ECF No. 1 at PageID 14–19 (grouping all all THRA claims as "Count II," all § 1981[7] claims as "Count III," and Fourteenth Amendment claims as "Count V")), Plaintiff appears to identify three "adverse actions" as the basis of his disparate treatment claims: (1) exclusion from the Foreman Development Program, which occurred sometime in late September or early October 2022; (2) his suspension on June 29, 2023; and (3) his termination on August 1, 2023.  (*See* ECF No. 67 at PageID 458; *see also* ECF No. 67-1 at PageID 474 (dating Plaintiff's conversation with supervisors about participation in the Foreman Development Program).)  Of these, Defendant's timeliness argument is relevant only to Plaintiff's exclusion from the Foreman Development Program.

The parties do not identify a precise date on which Plaintiff was denied entry to the Foreman Development Program, but Plaintiff does not dispute that this event took place "in or about late September/early October 2022."  (*See* ECF No. 67-1 at PageID 474.)  This date plainly falls outside the one-year limitation period for THRA and § 1983 claims.  To the extent Plaintiff seeks to rely on his exclusion from the Foreman Development Program as an adverse action for his disparate treatment claims under the THRA or claims under § 1983, he is time-barred from doing so.  Plaintiff also does not address Defendant's timeliness argument with respect to his THRA disparate treatment claim.  (*See generally* ECF No. 67 at 457–-65 (addressing the limitations period only as to Plaintiff's hostile work environment claim).)  For this reason, and because the undisputed date of Plaintiff's exclusion from the Foreman Development Program was at least more than one year before Plaintiff filed his Complaint in this matter, Defendant is entitled to summary judgment as a matter of law on Plaintiff's THRA and § 1983 disparate treatment claim

---

[7] Reference to Plaintiff's § 1981 claims is made because those claims are properly brought pursuant to § 1983.  *See infra* p. 30 & n. 12.

for exclusion from the Foreman Development Program, and its motion is **GRANTED** for this claim. *See Haddad v. Sec'y, U.S. Dep't of Homeland Sec.*, 610 F. App'x 567, 568–69 (6th Cir. 2015) (citation omitted) ("A plaintiff is deemed to have abandoned a claim when [he] fails to address it in response to a motion for summary judgment.").[8]

However, the same reasoning does not apply to Plaintiff's hostile work environment and retaliation claims. That's because a plaintiff may rely on otherwise time-barred acts of discrimination to establish a hostile work environment claim. *See Austion*, 244 F. App'x at 649–50 (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113, 117 (2002)) ("Provided that an act contributing to the chain occurs within the filing period, the entire period of the hostile environment may be considered by a court for the purposes of determining liability."); *Ruiz v. Butts Foods, L.P.*, No. W2023-01053-COA-R3-CV, 2025 WL 1099966, at *8 (Tenn. Ct. App. Apr. 14, 2025) (applying same principle to hostile work environment claims under the THRA). And Plaintiff's retaliation claims are also timely because Plaintiff's first instance of protected activity alleged in the Complaint was his grievance filed on December 8, 2022, (*see* ECF No. 1 at PageID 5–6), which is after the November 21, 2022, cutoff for his THRA and § 1983 claims to be timely.

---

[8] Defendant does not argue that Plaintiff's parallel Title VII claims are time-barred. (*See* ECF No. 63-1 at PageID 215 n.1.) Title 42 U.S.C. § 2000e-5 requires that, before asserting a Title VII claim, plaintiffs must file a charge of discrimination with a state or local agency within 300 days of the alleged unlawful employment action. *Austion v. City of Clarksville*, 244 F. App'x 639, 647 (6th Cir. 2007) (citing 42 U.S.C. § 2000e-5). Plaintiff filed his EEOC charge alleging discrimination and retaliation on August 9, 2023, so discrete events before October 13, 2022, would have been untimely. *Davis v. Metro Parks & Recreation Dep't*, 854 F. App'x 707, 712 (6th Cir. 2021). But recall that the parties did not provide a specific date for Plaintiff's exclusion from the Foreman Development Program—only agreeing that it happened in "late September/early October 2022." (ECF No. 67-1 at PageID 477.) Because discrete events that happened before October 13, 2022, are time barred, the lack of a specific date for this event looms large. But because Defendant did not argue that any of Plaintiff's Title VII claims are time barred, it is not addressed herein.

**B.**     **Title VII and Tennessee Human Rights Act Claims**

Plaintiff asserts claims of race-based discrimination (disparate treatment), harassment creating a hostile work environment, retaliation, and retaliatory harassment under Title VII and parallel provisions of the THRA.

1.     Race Discrimination (Disparate Treatment) Claims

Title VII and the THRA prohibit employers from failing or refusing to hire, discharging, or otherwise discriminating against any person with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race. 42 U.S.C. § 2000e-2(a)(1); Tenn. Code Ann. § 4-21-401(a). "Plaintiffs can prove discrimination with either direct or circumstantial evidence. Direct evidence 'consists of facts that, if believed, require the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions.'" *Patterson v. Kent State Univ.*, 155 F.4th 635, 644–45 (6th Cir. 2025) (quoting *Tennial v. United Parcel Serv., Inc.*, 840 F.3d 292, 302 (6th Cir. 2016)). "Circumstantial evidence, by contrast, is indirect evidence that gives rise to an inference of discrimination; it suggests, but does not require, the conclusion that discrimination occurred." *Id.*

When a plaintiff relies on circumstantial evidence to prove his claim, courts apply the burden-shifting framework from *McDonnell Douglas Corp. v. Green*. *Stewart v. Esper*, 815 F. App'x 8, 16 (6th Cir. 2020) (citing *McDonnell Douglas*, 411 U.S. 792 (1973)); *see Sybrandt v. Home Depot, U.S.A., Inc.*, 560 F.3d 553, 557 (6th Cir. 2009) ("Both this court and the state courts in Tennessee have evaluated claims brought under the THRA in the same manner as Title VII claims."). Under that framework, the plaintiff has the initial burden of establishing a prima face case of discrimination. *Stewart*, 816 F. App'x at 17 (citing *Upshaw v. Ford Motor Co.*, 610 F.3d 359, 364 (6th Cir. 2010)). To do so, the plaintiff must show that (1) he is a member of a protected

16

class; (2) he was subject to an adverse employment action; (3) he was qualified for his position; and (4) similarly situated employees outside his protected class were treated more favorably. *Id.* at 16 (citation omitted); *see Sybrandt*, 560 F.3d at 557.

If the plaintiff establishes a prima facie case, then the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions. *Stewart*, 815 F. App'x at 17 (citing *Upshaw*, 610 F.3d at 364). And if the defendant does so, the burden shifts back to the plaintiff to prove by a preponderance of the evidence that the defendant's offered reasons were pretextual. *Id.* "A plaintiff can show pretext in three interrelated ways: (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employer's action, or (3) that they were insufficient to motivate the employer's action." *Redlin v. Grosse Pointe Pub. Sch. Sys.*, 921 F.3d 599, 612 (6th Cir. 2019) (quoting *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009)) (citation modified). Specifically, the plaintiff must "identify evidence from which a reasonable jury could conclude that the proffered reason is actually a pretext for unlawful discrimination." *Jones v. Memphis Light, Gas & Water Div.*, 346 F. App'x 38, 43 (6th Cir. 2009) (citation omitted).

Plaintiff here relies on circumstantial evidence to support his claims, so the *McDonnell Douglas* burden shifting framework applies. To start, the parties do not dispute that Plaintiff has satisfied the first element of his prima facie case: that Plaintiff is a member of a protected class because of his race. But the parties disagree about almost everything else.

For the second element, the parties agree that Plaintiff's suspension and termination were adverse actions. But Defendant asserts that other events in the Complaint—that is, Plaintiff allegedly being compelled to sign the 2019 COCEA, being denied a new work vehicle, having his work vehicle searched, Matthews' and Deaton's purportedly inappropriate language towards him,

and being denied entry into the Foreman Development Program—do not rise to the level of adverse actions within the meaning of Title VII. (ECF No. 63-1 at PageID 217.) Of these, Plaintiff's response addresses only his exclusion from the Foreman Development Program as an adverse action. (*See* ECF No. 67 at PageID 457–60.) For that reason, the Court narrows its analysis for Plaintiff's disparate treatment claims to Plaintiff's exclusion from the Foreman Development program, his suspension, and his termination.[9]

So, was Plaintiff's exclusion from the Foreman Development Program an adverse employment action? An adverse employment action is "a change in an 'identifiable term or condition of employment'" that makes the employee "worse off." *Williams v. Memphis Light, Gas & Water*, No. 23-5616, 2024 WL 3427171, at *5 (6th Cir. July 16, 2024) (citing *Muldrow v. City of St. Louis*, 601 U.S. 346, 355, 359 (2024)). Although exclusion from an optional training program is generally not an adverse employment action, it may be if it results in the plaintiff being "worse off" because, for example, he missed out on increased or additional compensation. *See Logan v. MGM Grand Detroit Casino*, No. 21-1149, 2021 WL 6932348, at *4 (6th Cir. Dec. 22, 2021) (citing *Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 710 (6th Cir. 2007)). But the possibility that training could result in a future promotion is generally too speculative to be an adverse employment action. *See id.* (citations omitted). That is the case here. The Foreman Development Program allowed Locators to be trained and accrue skills that *could* make them

---

[9] In addition, Plaintiff signing the 2019 COCEA and being denied a new work vehicle were discrete events that occurred before November 21, 2022, so THRA claims based on those events are time barred. *See supra*, pp. 13–15. It is questionable whether Plaintiff exhausted his administrative remedies with respect to any claim for the Foreman Development Program, but Defendant did not raise this argument, so the Court will not address it. *Moore v. Coca-Cola Bottling Co. Consol.*, 113 F.4th 608, 621–22 (6th Cir. 2024).

18

eligible for promotion.  Without more, this possibility of future promotion is too speculative to make exclusion from the program an adverse employment action.  That dooms Plaintiff's claim.

That leaves only Plaintiff's claims based on his suspension and termination.  But Plaintiff has not made a prima facie case for these actions because he has not satisfied the fourth element— that a similarly situated employee outside his protected class was treated more favorably.  The only comparator Plaintiff identifies in his response is Ocampo.  Although Ocampo may have been similarly situated for a prima facie case for Plaintiff's exclusion from the Foreman Development Program, Plaintiff has not shown that Ocampo was similarly situated for his claims based on his suspension and termination.  Plaintiff has not alleged or come forward with evidence showing that Ocampo was not suspended or terminated despite violating similar workplace policies or engaging in conduct of comparable seriousness.  *See Hieber v. Oakland Cnty*, 136 F.4th 308, 329 (6th Cir. 2025) ("When determining whether employees engaged in similar misconduct, we look to 'the type, circumstances, and respective severity of the misconduct alleged.'" (citation omitted)); *Moore*, 113 F.4th at 625 ("At this stage, all that we look for is similarly situated comparators who 'were not fired' despite engaging in 'substantially identical conduct to that which the employer contends motivated its discharge of the plaintiff.'" (citation omitted)); *Jackson v. VHS Detroit Receiving Hosp., Inc.*, 814 F.3d 769, 777 (6th Cir. 2016) (explaining that, to be similarly situated, alleged comparators must "have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it").

But even assuming Plaintiff had established a prima facie case for his disparate treatment claims based on his suspension and termination, he has not shown that Defendant's reasons for its actions were pretextual. Plaintiff's firing, according to Defendant, was the result of Plaintiff's

19

threat to physically strike his former second-line supervisor.  (*See* ECF No. 63-2 at PageID 249; ECF No. 63-1 at PageID 227–30.)  Defendant contends that this conduct violated its Workplace Violence Policy and Plaintiff's still-active 2019 COCEA.  (ECF No. 63-1 at PageID 227; ECF No. 63-19.)  In support of its reasoning, Defendant points to the following evidence: its Corporate Security Office's Investigation Summary into the June 29 incident; its Workplace Violence Policy (ECF No. 63-24); the deposition testimony of several employees (including Plaintiff) who corroborated the verbal altercation between Plaintiff and Matthews; and Plaintiff's March 2019 COCEA. (*See* ECF Nos. 63-4, 63-5, 63-6, 63-7, 63-8, 63-14, 63-18, 63-24.)  Plaintiff's suspension and termination notices also explicitly state that these decisions were based on allegations that Plaintiff violated Defendant's Workplace Violence policy.  (*See* ECF Nos. 63-15, 63-19; *see also* ECF No. 63-6 at PageID 337 (stating, as part of Plaintiff's COCEA, that any behavior believed to be in violation of that agreement would be "thoroughly investigated" and result in immediate termination "[i]f it is determined that sufficient evidence exists to support the allegations").)  This evidence satisfies Defendant's burden under *McDonell Douglas* to articulate a legitimate, non-discriminatory reason for its decisions to suspend and terminate Plaintiff.

The burden thus shifts back to Plaintiff to demonstrate, by a preponderance of the evidence, that Defendant's stated reasoning was pretext for unlawful discrimination.  Plaintiff points the following four things, which he says undermines Defendant's stated rationale for his termination: First, he alleges that "[t]here is no evidence that [he] ever touched Matthews," and in fact, Plaintiff has consistently testified that Matthews initiated physical contact.  (ECF No. 67 at PageID 464.)  Second, Plaintiff contends that "there is conflicting testimony regarding whether [Plaintiff] threatened Blakney," as only four of the twelve witnesses interviewed by Corporate Security reported hearing Plaintiff tell Blakney, "I'll hit you too."  (*Id.* at PageID 465.)  Third, Plaintiff

argues that certain "investigative failures" support a finding of pretext, namely that Deaton testified

he did not "independently verify" certain facts before affirming the decision to terminate Plaintiff.

(*Id.*) Finally, Plaintiff asserts that Defendant's "shifting justification for other adverse actions,"

including exclusion of Plaintiff from the Foreman Development Program, support a finding of

pretext. (*Id.*) Ultimately, none of these things create a genuine issue of material fact about pretext.

"[A]s long as an employer has an honest belief in its proffered nondiscriminatory reason

for discharging an employee, the employee cannot establish that the reason was pretextual," even

if the employer's reasoning is "ultimately shown to be incorrect." *Sybrandt*, 560 F.3d at 559

(quoting *Majewski v. Auto. Data Processing, Inc.*, 274 F.3d 1106, 1117 (6th Cir. 2001)). The key

inquiry in assessing if an employer holds such an honest belief is "whether the employer made a

reasonably informed and considered decision before taking the complained-of action." *Id.* (citing

*Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 598–99 (6th Cir. 2007)); *see also Michael*,

496 F.3d at 599 ("[W]e do not require that the decisional process used by the employer be optimal

or that it left no stone unturned."); *Hardesty v. Kroger Co.*, 758 F. App'x 490, 495 (6th Cir. 2019).

("[W]hen we evaluate the honesty of an employer's belief, we do not require evidence of an

optimal decisional process or a scorched-earth investigation." (citation omitted).).

Defendant has offered evidence that its decision to suspend Plaintiff was made after

Plaintiff—by his own admission—was involved in a verbal altercation with one of his supervisors,

Matthews, in which he "threw [his] stuff down," said to Matthews, "If you want to hit me, hit me,

go ahead," and then had to be physically removed by a coworker. (ECF No. 67-5 at PageID 757.)

Plaintiff's first argument that he never touched Matthews is not relevant and does not support

pretext: Corporate Security's investigation did not find that Plaintiff had hit or touched Matthews,

so its conclusion could not have been based on that. (*See* ECF No. 63-18.) Second, conflicting

21

testimony about whether Plaintiff threatened Blakeny also falls short. "[I]nvestigations often produce conflicting evidence, requiring an employer to evaluate credibility and weigh various pieces of information. Just because an employer must choose between inconsistent accounts 'does not mean that there inevitably is a genuine issue of fact concerning the employer's good faith.'" *Hardesty*, 758 F. App'x at 494. Third, Defendant's Corporate Security Office conducted a thorough investigation of the incident, interviewing several witnesses in addition to Matthews and Plaintiff. (*See* ECF No. 63-18.) Finally, Plaintiff does not explain why Deaton should have "independently verified" that investigation or what facts in the investigation he disputes.

Defendant's Corporate Security conducted a sufficiently diligent investigation, which concluded that Plaintiff had violated several of Defendant's workplace policies. (*See id.* at PageID 427.) And relying on that conclusion, Defendant's human resources department recommended that Plaintiff be terminated for violating Defendant's policies and the terms of his COCEA. (ECF No. 63-5 at PageID 331; ECF No. 71-6 at PageID 1085; ECF No. 63-18 at PageID 427; *see also* ECF No. 63-1 at PageID 228.) Defendant's decisions to suspend and terminate Plaintiff were "reasonably informed and considered." *Sybrandt*, 560 F.3d at 560 (citation omitted). Plaintiff therefore has not shown that Defendant's reasons were pretextual.

In sum, Plaintiff's discrimination claims fail because he has not met his burden to show that he was subject to an adverse employment action (for exclusion from the Foreman Development Program), or that similarly situated employees outside his protected class were treated more favorably or Defendant's reasons were pretextual (for suspension and termination). Defendant's motion is **GRANTED** with respect to Plaintiff's race discrimination claims under Title VII and the THRA.

2.    Hostile Work Environment Claim[10]

For a Title VII claim of harassment creating a hostile work environment, a plaintiff must make direct or inferential allegations that: (1) he belonged to a protected group, (2) he was subject to unwelcome harassment, (3) the harassment was based on his protected status, (4) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment, and (5) the defendant knew or should have known about the harassment and failed to act. *Middleton v. United Church of Christ Bd.*, No. 20-4141, 2021 WL 5447040, at *3 (6th Cir. Nov. 22, 2021) (citation omitted); *Stewart*, 815 F. App'x at 20 (citation omitted); *Wyatt v. Nissan N. Am., Inc.*, 999 F.3d 400, 411 (6th Cir. 2021) ("Harassment creates a hostile work environment when the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." (citation modified)); *see Smith v. P.A.M. Transp., Inc.*, 154 F.4th 375, 382–83 (6th Cir. 2025) (applying same framework to hostile work environment claims under the THRA and § 1981).

Existence of the fourth element—harassment sufficiently severe or pervasive to create an abusive work environment—"is quintessentially a question of fact." *Kellar v. Yunion, Inc.*, 157 F.4th 855, 874 (6th Cir. 2025) (citation modified).  To answer that question, courts "consider the

_____

[10] It is again questionable whether Plaintiff properly exhausted these claims.  *See supra*, p. 18 n. 9; *Golden v. Mirabile Inv. Corp.*, 724 F. App'x 441, 445–46 (6th Cir. 2018).  His EEOC charge recounts that Defendant hired him in or about May 2008; that he filed an internal grievance against Blakney and Matthews on December 28, 2022; and that he was terminated on August 1, 2023.  (ECF No. 63-22 at PageID 438.)  On those facts, Plaintiff alleged that he had been discriminated against based on his race and retaliated against in violation of Title VII.  (*Id.*)  Defendant, however, has not asserted that Plaintiff failed to exhaust his administrative remedies for these claims, so the Court need not address it.  *See Moore*, 113 F.4th at 622 ("Failure to exhaust in the context of Title VII claims is an affirmative defense that defendants 'bear[ ] the burden of pleading and proving.'" (citation omitted)).

totality of the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *McNeal v. City of Blue Ash*, 117 F.4th 887, 904 (6th Cir. 2024); *Kellar*, 157 F.4th at 874; *Stewart*, 815 F. App'x at 20. "In determining whether the harassment is sufficiently severe or pervasive to create a hostile work environment, 'the conduct in question must be judged by both an objective and a subjective standard.'" *Johnson v. Ford Motor Co.*, 13 F.4th 493, 505 (6th Cir. 2021) (citation omitted); *Stewart*, 815 F. App'x at 20.

"However, the third element limits the scope of this analysis: only harassment *based on the plaintiff's race* may be considered." *Williams v. CSX Transp. Co.*, 643 F.3d 502, 511 (6th Cir. 2011). That is because "Title VII does not prohibit all verbal or physical harassment in the work place; it is directed only at discriminat[ion]  because of protected characteristics under the statutes." *Khalaf v. Ford Motor Co.*, 973 F.3d 469, 484 (6th Cir. 2020) (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998)) (citation modified). In other words, "the conduct of jerks, bullies, and persecutors is simply not actionable under Title VII unless they are acting because of the victim's [protected status]." *Id.* (quoting *Wasek v. Arrow Energy Servs., Inc.*, 682 F.3d 463, 467 (6th Cir. 2012)). A plaintiff may satisfy this element "by adducing evidence of the use of race-specific and derogatory terms, or comparative evidence of how the alleged harassers treated members of both races in a mixed-race workplace." S*mith*, 154 F.4th at 383 (citing *Strickland v. City of Detroit*, 995 F.3d 495, 503 (6th Cir. 2021)). But "the harassing conduct need not be overtly racist to qualify," the plaintiff must simply show that "it would not have occurred *but for* the plaintiff's race." *Williams*, 643 F.3d at 511 (emphasis added).

Defendant does not dispute the first element—that Plaintiff belongs to a protected group. But it asserts that Plaintiff cannot satisfy the remaining elements of his hostile environment claim.

Plaintiff alleges that there is a genuine dispute for trial on his claim and points to the following in support:

- Matthews referring to Plaintiff using obscene language during a phone call with Jarrett in October 2022 (ECF No. 67 at PageID 460);

- Matthews physically confronting Plaintiff on June 29, 2023, "including shoving him, grabbing his elbow, and jabbing a finger into his face" (*id.* at PageID 461);

- Plaintiff and other black locators "were routinely excluded from post-shift social gatherings while white employees received more favorable assignments and were not disciplined for attendance issues" (*id.*).

Plaintiff, however, has not come forward with evidence that the above incidents of alleged harassment were based on race. None of the alleged harassment involves race-specific or derogatory terms. Nor does Plaintiff point to evidence that Matthews, or any other supervisors or coworkers, ever used racist language—not only in the above incidents but at any other time during Plaintiff's employment at MLGW.

Plaintiff's comparative evidence is also not persuasive. Although his response alleges that black Locators "were routinely excluded from post-shift social gatherings," and that white employees "received more favorable assignments and were not disciplined for attendance issues," his testimony cited in support of these assertions gives scant details. Plaintiff testified that Matthews, along with two or three white coworkers, would go to bars and drink together, and at work the next day, the coworkers would be "laughing and joking," and "talk[ing] about how much fun they had" and "how some of them couldn't get up to come to work that day." (ECF No. 67-5

25

at PageID 789.)  Plaintiff testified that these white coworkers would sometimes call in sick after their nights out drinking together and to Plaintiff's knowledge, they did not have to provide doctor's notes.  (*Id.*)  Plaintiff acknowledged that Matthews and the coworkers appeared to have a friendship outside of work but maintained that the alleged preferential treatment was due to race, not friendship.  (*Id.* at PageID 755, 790.)  But Plaintiff's testimony lacks details about how Matthews (or anyone else) treated black employees.   Plaintiff's testimony about alleged preferential treatment for two to three people outside of Plaintiff's protected class is not sufficient probative evidence for a jury to conclude that the alleged harassment would not have occurred *but for* Plaintiff's race.  *See Khalaf*, 973 F.3d at 485 ("This court has held that a comparison between one member of a protected class and one employee outside of that protected class is not 'comparative evidence about how the alleged harasser[s] treated *members* of both races in a mixed-race workplace.'" (citing *Williams*, 643 F.3d at 511)); *cf.  Rembert v. Swagelok Co.*, No. 22-3554, 2023 WL 3094546, at *1 (6th Cir. Apr. 26, 2023) (noting that, in addition to plaintiff's evidence of threats and harassment, he had presented evidence of differential treatment, including that his boss excluded him from "shop talks" on the basis that he was a temporary employee, yet "several white temporary employees were included"); *see also Kellar*, 157 F.4th at 875 (concluding that the plaintiff  "need[ed] more than broad, conclusory statements alleging harassment").

The alleged harassment was also not severe or pervasive.  Plaintiff has not asserted that the harassing behavior was "commonplace, ongoing, and continual."  *Abeita v. TransAmerica Mailings, Inc.*, 159 F.3d 246, 252 (6th Cir. 1998); *cf. Johnson*, 13 F.4th at 506 (employee alleged that co-worker was "constantly harassing her").  Nor can that inference be drawn based on the facts identified by Plaintiff.  Matthews' use of obscenity in reference to Plaintiff was an isolated incident.  And Matthews was not speaking to Plaintiff when he said it; rather, he was speaking to

26

Jarrett during a phone call, which Plaintiff overheard, making the comment overall less severe. *See Pantoja v. Michigan Dep't of Corr.*, No. 1:23-CV-563, 2025 WL 3299734, at *3 (W.D. Mich. Apr. 17, 2025) (noting that indirect or "second-hand" harassing comments are less severe and collecting cases). Of course, this event is not considered in isolation. But considering it along with the altercation between Matthews and Plaintiff and Matthews' alleged socialization with two to three white coworkers, Plaintiff still has not shown "a workplace culture of harassment permeated with hostility towards the protected class."[11] *Kellar*, 157 F.4th at 873.

Because Plaintiff has not come forward with sufficient probative evidence to support his hostile work environment claim, Defendant is entitled to summary judgment on this claim.

3.    Retaliation and Retaliatory Harassment Claims

Retaliation claims under Title VII are brought pursuant to the "opposition clause" of Title VII, which makes it unlawful for any employer to discriminate against any employee "because he has opposed any practice made . . . unlawful . . . by this subchapter." 42 U.S.C. § 2000e-3(a); *see Kirkland v. City of Maryville*, 54 F.4th 901, 910 (6th Cir. 2022) (citations omitted) (writing that retaliation is an actionable claim under both Title VII and the THRA and that "claims under these respective laws are evaluated identically"). The clause "protects not only the filing of formal discrimination charges with the EEOC, but also complaints to management and less formal protests of discriminatory employment practices." *Laster v. City of Kalamazoo*, 746 F.3d 714, 730 (6th Cir. 2014) (citations omitted).

---

[11] And this remains true even taking into account two additional events that Plaintiff did not identify in his response as contributing to an alleged hostile work environment: (1) the "end of 2022" incident when Matthews "raised his voice," to Plaintiff and three other black employees, and (2) the May 2023 meeting when Deaton allegedly told Plaintiff to "shut his mouth" in front of coworkers.

As with Title VII discrimination claims, where a plaintiff offers circumstantial evidence to support his retaliation claim, the *McDonell Douglas* burden-shifting framework applies. *Henry v. S. Ohio Med. Ctr.*, 155 F.4th 620, 634 (6th Cir. 2025) (citing *Taylor v. Geithner*, 703 F.3d 328, 336 (6th Cir. 2013)). So, again, a plaintiff must first make a *prima facie* case, and then the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions. *Id.* (citation omitted). If the defendant satisfies its burden, the plaintiff must then demonstrate pretext. *See id.*

To establish a prima face case of retaliation or retaliatory harassment, a plaintiff must show that (1) he engaged in activity protected by Title VII; (2) the defendant knew the plaintiff engaged in protected activity; (3) the defendant took an adverse employment action against the plaintiff or subjected him "to severe or pervasive retaliatory harassment by a supervisor"; and (4) a causal connection existed between the protected activity and the adverse employment action or severe or pervasive harassment. *Williams*, 2024 WL 3427171, at *8 (citation omitted); *see Henry*, 155 F.4th at 634 (citing *Taylor*, 703 F.3d at 336). "Title VII retaliation claims 'must be proved according to traditional principles of but-for causation,' which 'requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer.'" *Laster*, 746 F.3d at 731 (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013)).

*Suspension and Termination.* Plaintiff contends that his suspension and termination were retaliation for the internal grievances and complaints he made alleging harassment, bullying, and discrimination. (ECF No. 67 at PageID 462.) But even assuming that Plaintiff can establish a prima facie case of retaliation, his claim still fails because, as discussed above for his disparate treatment claim, Defendant has offered a nondiscriminatory reason for suspending and terminating him, and Plaintiff has not shown that Defendant's reason was pretextual.

*Retaliatory Harassment*.  For his retaliatory hostile work environment claim, Plaintiff must show that he was subjected to "severe or pervasive" harassment by a supervisor after he engaged in protected activity.  *Ogbonna-McGruder v. Austin Peay State Univ.*, 91 F.4th 833, 841–42 (6th Cir. 2024); *see Wyatt*, 999 F.3d at 426 (noting that the standard for actionable harassment in the retaliation context is the same standard applied in the discrimination context).  In his response, Plaintiff identifies only a single instance of harassment that he says was retaliatory—Deaton allegedly yelling at him to "shut his mouth" at a meeting in front of 25 coworkers.[12]  (*See* ECF No. 67 at PageID 462–63.)  But this single incident is not sufficiently serious to constitute severe or pervasive harassment.  *See Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (explaining that "the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing" are insufficient to create a hostile environment for purposes of Title VII); *Stewart*, 815 F. App'x at 20–21 (citing *Faragher*, 524 U.S. at 788).

For the above reasons, Defendant is entitled to summary judgment on Plaintiff's claims for retaliation and retaliatory harassment.

## C.     Title 42 U.S.C. §§ 1981 and 1983 Claims

As an initial matter, Plaintiff's Complaint contains separate counts for his claims under § 1981 and his Fourteenth Amendment claims pursuant to § 1983.  However, "no independent cause

---

[12] Plaintiff's suspension and termination "cause[d] a change in the terms or conditions of [his] employment," so they are excluded from the analysis of his retaliatory hostile environment claims.  *McNeal*, 117 F.4th at 901.

In his response, Plaintiff does not argue that the search of his work truck in December 2022, was retaliatory harassment.  For that reason, and because Plaintiff has not come forward with evidence showing that Blakney knew about Plaintiff's protected activity when he instructed Freddie Hawkins to search Plaintiff's work truck, that incident is not included in the Court's analysis.  But even if it was, it would still be insufficient, when considered along with all the circumstances, to show that Plaintiff was subjected to an objectively hostile work environment.

of action against municipalities is created by § 1981(c)," and "the express cause of action for damages created by § 1983 constitutes the exclusive federal remedy for violation of the rights guaranteed in § 1981 by state governmental units . . . ."  *Inner City Contracting, LLC v. Charter Twp. of Northville*, 87 F.4th 743, 754 (6th Cir. 2023) (citing *Arendale v. City of Memphis*, 519 F.3d 587, 599 (6th Cir. 2008) and *Jett v. Dallas Indep. Sch. Dist*, 491 U.S. 701, 733 (1989)).  So Plaintiff's § 1981 claims are evaluated using the § 1983 framework.[13]  *Id.*

> Title 42 U.S.C. § 1983 provides as follows:
>
> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

Section 1983 is not the source of any substantive right; it merely provides a method for vindicating federal rights elsewhere conferred.  *Graham v. Connor*, 490 U.S. 386, 393–94 (1989). "To prevail on a cause of action under § 1983, a plaintiff must prove '(1) the deprivation of a right secured by the Constitution or laws of the United States (2) caused by a person acting under the color of state law.'"  *Shadrick* v. *Hopkins Cnty.*, 805 F.3d 724, 736 (6th Cir. 2015) (quoting *Jones v. Muskegon Cnty.*, 625 F.3d 935, 941 (6th Cir. 2010)); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 150 (1970).

"A body politic is a 'person' within the meaning of § 1983."  *Franklin v. Franklin Cnty.*, 115 F.4th 461, 470 (6th Cir. 2024) (quoting *Ford v. Cnty. of Grand Traverse*, 535 F.3d 483, 495 (6th Cir. 2008)).  But a local government entity, like Defendant, is not liable under § 1983 solely because an injury was inflicted by its employees; instead, a plaintiff must show that his injuries

---

[13] And Plaintiff appears to have conceded this issue after it was raised in Defendant's Motion.  (*See* ECF No. 63-1 at PageID 214; ECF NO. 67 at PageID 457.)

were sustained pursuant to an illegal custom or policy of the local government entity. *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694 (1978); *Harness v. Anderson Cnty.,* No. 21-5710, 2023 WL 4482371, at *2 (6th Cir. July 12, 2023) ("A plaintiff suing a municipality under § 1983 must show that she experienced a constitutional injury as the result of an official municipal policy."). Put differently, a municipality is not liable under § 1983 *unless* a plaintiff shows that his rights were violated *because of* a municipal policy or custom. *Franklin*, 115 F.4th at 470. The Sixth Circuit has identified "at least four avenues" through which a plaintiff may prove the existence of an unlawful municipal policy or custom. *Id.* (quoting *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005)). These include "(1) the municipality's legislative enactments or official agency policies; (2) actions taken by officials with final decision-making authority; (3) a policy of inadequate training or supervision; or (4) a custom of tolerance or acquiescence of federal rights violations." *Id.*

Plaintiff relies on the second and fourth avenues to impose liability here.

Under the second, a municipality is liable for an official's action "if the official is the one who has the final authority to establish municipal policy with respect to the action ordered." *Arnold v. City of Columbus*, 515 F. App'x 524, 538 (6th Cir. 2013) (quoting *Feliciano v. City of Cleveland*, 988 F.2d 649, 655 (6th Cir. 1993)) (internal quotation marks omitted); *Harness v. Anderson Cnty.*, No. 21-5710, 2023 WL 4482371, at *2 (6th Cir. July 12, 2023) ("To be a final policymaker, the official must 'possess[ ] final authority to establish municipal policy with respect to the action ordered.'" (citation omitted)). "Whether an official has final policy making authority is a question of state and local law." *Goza v. Memphis Light Gas & Water Div.*, No. 2:17-CV-2873-JPM-DKV, 2019 WL 11706044, at *10 (W.D. Tenn. Jan. 9, 2019) (quoting *O'Brien v. City of Grand Rapids*, 23 F.3d 990, 1001 (6th Cir. 1994)). A municipality can also be liable if a final

31

policymaker ratifies a subordinate employee's decision. *Arnold*, 515 F. App'x at 538. "However, 'mere acquiescence in a single discretionary decision by a subordinate is not sufficient to show ratification.'" *Id.* (quoting *Feliciano*, 988 F.2d at 656).

Under the fourth avenue, even "[i]n the absence of a formally approved policy, a 'custom' can give rise to municipal liability when the 'practice is so widespread as to have the force of law.'" *North v. Cuyahoga Cnty.*, 754 F. App'x 380, 386 (6th Cir. 2018) (quoting *Bd. of Cnty. Comm'rs of Bryan Cnty., v. Brown*, 520 U.S. 397, 404–05 (1997)). To prove a policy or custom of tolerance, a plaintiff must show:

> (1) the existence of a clear and persistent pattern of [wrongdoing];
> (2) notice or constructive notice on the part of the [municipal body];
> (3) the [municipal body's] tacit approval of the unconstitutional conduct, such that their deliberate indifference in their failure to act can be said to amount to an official policy of inaction; and
> (4) that the [municipal body's] custom was the "moving force" or direct causal link in the constitutional deprivation.

*Stucker v. Louisville Metro Gov't*, No. 23-5214, 2024 WL 2135407, at *9 (6th Cir. May 13, 2024) (quoting *Doe v. Claiborne Cnty. ex rel. Claiborne Cnty. Bd. of Educ.*, 103 F.3d 495, 508 (6th Cir. 1996)). This standard requires a showing of a municipal body's "deliberate indifference," meaning that "the municipality has failed to act 'in response to repeated complaints of constitutional violations by its officers.'" *Id.* at *11 (quoting *Ouza v. City of Dearborn Heights*, 969 F.3d 265, 287 (6th Cir. 2020)). Deliberate indifference can be demonstrated through a "pattern of similar constitutional violations showing [] [p]olicymakers' continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees." *Id.* (quoting *Connick v. Thompson*, 563 U.S. 51, 62 (2011)) (internal quotation marks omitted). Although the Sixth Circuit has not identified a minimum threshold required to show a pattern of similar violations, it has made clear that "a plaintiff cannot rely solely on a single instance to prove the existence of an

32

unconstitutional custom." *Franklin*, 115 F.4th at 472 (quoting *Winkler v. Madison County*, 893 F.3d 877, 901 (6th Cir. 2018)) (citation modified); *see also id.* (summarizing recent Sixth Circuit caselaw finding that one, and up to three, instances of past misconduct were insufficient to establish a "pattern," but five instances were adequate); *Nouri v. Cnty. of Oakland*, 615 F. App'x 291, 296 (6th Cir. 2015) ("But we have never found notice of a pattern of misconduct (or the pattern itself) solely from the mistreatment of the plaintiff." (citation omitted)); *Miller v. City of Memphis*, No. 2:23-CV-02315-MSN-ATC, 2025 WL 2946183, at *4 (W.D. Tenn. July 7, 2025), *report and recommendation adopted*, No. 2:23-CV-02315-MSN-ATC, 2025 WL 2811041 (W.D. Tenn. Sept. 29, 2025).

Starting with Plaintiff's first theory of municipal liability (the second avenue), Plaintiff says that Defendant is liable due to actions of a final policymaker because when Deaton "drafted [Plaintiff's] termination letter and approved discipline" for Plaintiff, those were "actions taken with final policymaking authority." (ECF No. 67 at PageID 466). But Plaintiff offers no law to support his allegation that Deaton's approval of Plaintiff's suspension or termination amounted to a final policymaking decision. And Plaintiff later undermines his own contention that Deaton was even responsible for these decisions. (*See* ECF No. 67 at PageID 454 ("Deaton testified that the decision to suspend and later terminate [Plaintiff] was made by Corporate Security and Human Resources, not by him personally.").) Plaintiff also provides no state or local law, or even an internal policy of Defendant, to demonstrate that Deaton, Blakney, or Matthews had final authority to establish municipal policy on behalf of Defendant. Plaintiff's only evidence that the conduct of Deaton, Blakney, or Matthews may be attributed to Defendant under § 1983 is that they held supervisory positions. But "[m]ere authority to exercise discretion while performing particular functions does not make a municipal employee a final policymaker . . . [.]" *Feliciano*, 988 F.2d at

33

655.  Plaintiff's *ipse dixit* about Deaton's authority as a final policymaker is insufficient to impose liability on Defendant pursuant to § 1983.

Plaintiff's other argument is that Defendant had a policy or custom of tolerance for constitutional violations. He asserts that Defendant was "on notice of the hostile environment through multiple grievances, an EEOC charge, and the May 2023 settlement that required management to conduct civility training."  (ECF No. 67 at PageID 466.)  He also says that Defendant acted with deliberate indifference to the 2019 COCEA being a violation of his due process rights because in arbitration proceedings between Defendant and another unnamed employee, enforcement of the other employee's COCEA "was deemed improper due to MLGW's failure to adhere to . . . MOU-mandated due process protections."  (ECF No. 67 at PageID 466.)  But neither Plaintiff's list of personal grievances, nor the singular instance of an arbitration award for another employee, is sufficient to establish a clear, consistent pattern of deliberate indifference amounting to a custom of tolerance.  *Nouri*, 615 F. App'x at 296; *Franklin*, 115 F.4th at 472.

Plaintiff has failed to show that his rights were violated due to a municipal policy or custom, so Defendant cannot be held liable for Plaintiff's injuries.  Defendant is therefore entitled to summary judgment on Plaintiff's claims under 42 U.S.C. §§ 1981 and 1983, and its Motion is **GRANTED** for those claims.

D.     **Negligent Infliction of Emotional Distress Claim**

Finally, Defendant asserts that it is entitled to summary judgment on Plaintiff's state law claim for negligent infliction of emotional distress ("NIED").  In his Complaint, Plaintiff characterizes this claim as arising under the Tennessee Healthy Workplace Act ("THWA"), alleging that Defendant "[has] violated every provision of the [THWA] and [the City of Memphis'] own 'Respectful Workplace Policy.'"  (*See* ECF No. 1 at PageID 22–23.)  Defendant contends that

34

Plaintiff's NIED claim must fail for two reasons.  First, because the THWA does not provide an independent cause of action; it merely incentivizes employers to adopt policies that comply with its model policy. (ECF No. 63-1 at PageID 230 (citing Tenn. Code Ann. § 50-1-504(b)).)  And second, that even if read as an independent state law claim, it still fails because it is barred by the exclusive remedy provision of the Tennessee Worker's Compensation ACT ("TWCA").  (*Id.* at PageID 231.)

To start, Plaintiff fails to address his NIED claim anywhere in his response to Defendant's Motion.  As a result, this claim is deemed waived.  *Alexander v. Carter for Byrd*, 733 F. App'x 256, 261 (6th Cir. 2018) (citing *Haddad*, 610 F. App'x at 568–69).  However, even in the absence of such waiver, the claim fails on the merits.  The THWA explicitly provides that "[n]othing in this section creates a cause of action against an employer who does not adopt the model policy . . . or adopt a policy conforming to the requirements set out in § 50-1-503(b)."  Tenn. Code Ann. § 50-1-504(b).  And because Plaintiff's NIED claim arises out of essentially the same circumstances as his civil rights claims, the Tennessee Governmental Tort Liability Act ("TGTLA") shields Defendant from liability, even if Plaintiff's claim is construed as a state law negligence claim.  *See DeSoto v. Bd. of Parks & Recreation*, 64 F. Supp. 3d 1070, 1086 (M.D. Tenn. 2014) (dismissing NIED claim because the TGTLA preserves municipal immunity for negligent injuries arising from alleged civil rights violations).  Defendant's Motion for Summary Judgment is thus **GRANTED** with respect to Plaintiff's NIED claim.

## CONCLUSION

For the reasons explained above, Defendant's Motion for Summary Judgment (ECF No. 63) is **GRANTED** for all claims.

**IT IS SO ORDERED**, this 19th day of March, 2026.

*s/ Mark S. Norris*
MARK S. NORRIS
UNITED STATES DISTRICT JUDGE